## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOLORES B. SPARKS,** | : | **No. 3:05cv2274** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **SUSQUEHANNA COUNTY,** | : | |
| **WILLIAM BRENNAN,** | : | |
| **SUSQUEHANNA COUNTY PRISON** | : | |
| **BOARD,** | : | |
| **JOHN DOES 1-10,** | : | |
| **HASSAN KHALIL,** | : | |
| **JOANN WISER, and** | : | |
| **CAROLE SMALACOMBE,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court are defendants' motions for summary judgment (Docs. 64, 66).  Having been fully briefed and argued, the matter is ripe for disposition.

**Background**[1]

This suit arises out of the death of Beth Ann Croasdale ("Decedent") at the Susquehanna County Correctional Facility ("SCCF") on April 2, 2004.  On that day, Croasdale suffered a severe asthma attack; she was transported from the prison to a local hospital and was pronounced dead. The deceased was admitted to the SCCF

---

[1]These background facts rely on the statements of material facts provided by the moving parties and the responses to them by the plaintiff.  The court will cite to the moving parties' material facts for those facts which are undisputed.  Where the parties dispute the facts, the court will note that.

in January 2004 for operating a vehicle with a suspended or revoked license.

(Amended Complaint (hereinafter "Cmplt") (Doc. 33) at ¶ 11). On the day she died,

Croasdale remained incarcerated at the SCCF.  (Statement of Material Facts of

Defendants Susquehanna County; William Brennan; Susquehanna County Prison

Board; Joann Wiser and Carole Smalacombe (Doc. 67) (hereinafter "County

Defendants' Statement") at ¶ 2).  Plaintiff alleges in part that the defendants failed to

provide Croasdale with access to Albuterol and the device she needed to deliver the

medication she needed to control her severe asthma, and that her death was thus

the result of defendants' deliberate indifference to Croasdale's serious medical need.

(Id. at ¶ 4).

On February 4, 2004, Croasdale submitted a request to the Warden,

Defendant Brennan, asking that she be allowed to have her nebulizer[2] in her cell.

(Id. at ¶ 5).  Plaintiff points out that Croasdale complained that she did not have

access to her medication, writing that she should have used her nebulizer four times

a day but had only been able to use it once, and then after waiting ten-fifteen

minutes.  (Plaintiff's Statement of Facts in Response to Defendants' Susquehanna

---

[2]A nebulizer is one way of delivering asthma medication.  Many asthma patients use inhalers, which "are hand-held portable devices that deliver medication directly to the lungs."  Mayo Clinic Staff, Asthma inhalers: Which one's right for you? available at http://www.mayoclinic.com/health/asthma-inhalers/HQ01081.  Inhalers can deliver a variety of medications to treat asthma and its shot-term symptoms.  Id.  Not all asthma patients can use inhalers, and "[n]ebulizers are designed for those who can't use an inhaler, such infants, young children and those who are seriously ill."  Id.  A nebulizer "workers by converting medication into a mist and delivering it through a mask that you wear over your nose and mouth."  Id.

County; William Brennan; Susquehanna County Prison Board; Joann Wiser and Carole Smalacombe's Statement of Facts (Doc. 80) (hereinafter "Plaintiff's Response to County Defendants' Statement") at ¶ 5).  This situation, plaintiff contends, violated a direct order in the prison allowing Croasdale to have access to the inhaler four times a day.  (Id.).

The Susquehanna County Defendants (Susquehanna County, William Brennan, Susquehanna County Prison Board, Joann Wiser and Carole Smalacombe) contend that prison records indicate that officials approved this request on February 10, 2004.  (County Defendants' Statment at ¶ 6).  Plaintiff complains that defendants make no reference to the record for this fact.  (Plaintiff's Response to County Defendants' Statement at ¶ 6).  In addition, she points out that Defendant Brennan attempted to hide a document during the course of the litigation (the inmate request form).  (Id.).  This previous action, plaintiffs insist, should lead the court to discount the current claim.  (Id.).

Defendants also contend that testimony from witnesses indicate that Croasdale had access to the nebulizer and Albuterol from February 10, 2004. (County Defendants' Statement at ¶ 7).  Plaintiff points out that the statements from two of the witnesses, Deborah Corgan and Tracey Sherman, are unsworn statements from Croasdale's former cellmates.  (Plaintiff's Response to County Defendants' Statement at ¶ 7).  These statements, she argues, should be discounted because no one could cross-examine them and because fear of

3

retaliation from the defendants could have influenced their statements.  (Id.).

Plaintiff also disputes whether the other statements cited by defendants support

defendants' argument.  (Id.).  In any case, an autopsy performed on Croasdale

revealed a high level of Albuterol in her bloodstream.  (County Defendants'

Statement at ¶ 8).  Plaintiff's expert, after reviewing the toxicology report, came to a

similar conclusion.  (Id.).

Defendant Joanne Wiser was the Correctional Officer on duty at the time of

Croasdale's death.  (Id. at ¶ 9).  She testified that she was trained and certified in

CPR.  (Id.).  Croasdale had an asthma attack while Wiser was in charge of the cell

block, and Wiser did not perform CPR.  (Id. at ¶ 10).  The parties dispute the

reasons for this failure.  (Id. at ¶ 10; Plaintiff's Response to County Defendants'

Statement at ¶ 10).  Defendants contend that Wiser was trained not to perform CPR

on an inmate who was breathing, as Croasdale was.  (County Defendants' Statment

at ¶ 10).  Plaintiff insists that Wiser did not testify that she was trained not to take

such action, but instead that she assumed that CPR should not be performed on a

breathing patient.  (Plaintiff's Response to County Defendants' Statement at ¶ 10).

Moreover, plaintiff contends that several witnesses testified that Wiser had reported

she would "never" perform CPR on an inmate.  (Id.).  Defendants claim that no

expert testimony indicates that this failure to perform CPR contributed to Croasdale's

death.  (County Defendants' Statement at ¶ 11).  Plaintiff agrees that the expert

reports do not state explicitly that a lack of CPR caused the death, but points out that

4

the reports allege that the failure to administer CPR fell below a reasonable standard of care and represent deliberate indifference to a serious medical need.  (Plaintiff's Response to County Defendants' Statement at ¶ 11).

Plaintiff asserts that defendants did not perform any adequate medical examination of the decedent when she was admitted to the SCCF.  (County Defendants' Statement at ¶ 13).  Defendants contend that Dr. Hassan Khalil, the prison doctor, examined decedent when she arrived there on January 19, 2004.  (Id. at ¶ 14).  Plaintiff points out that defendants cite no evidence to prove that this examination occurred, and argue that in any case the examination was wholly inadequate.  (Plaintiff's Response to County Defendants' Statement at ¶ 14).

Defendants contend that the prison had a policy of allowing staff to call Dr. Khalil or his practice whenever a medical issue occurred.   (County Defendants' Statement at ¶ 15).  Plaintiff points out that defendants do not cite to the record for this claim, and contend that Dr. Khalil testified only that he was available for consultations by telephone about medication at any time.  (Plaintiff's Response to County Defendants' Statement at ¶ 15).  Defendants also claim that Dr. Khalil saw decedent every time she requested medical attention, but plaintiff contends that the records do not indicate that Khalil actually saw the decedent and that even if he saw her, he gave her only a cursory examination.  (County Defendants' Statement at ¶ 16; Plaintiff's Response to County Defendants' Statement at ¶ 16).  When Dr. Khalil saw a patient and ordered medication, he was usually assisted by Diane Barron, a

5

Correctional Officer who had no medical training.  (County Defendants' Statement at ¶ 17; Plaintiff's Response to County Defendants' Statement at ¶ 17).  She ordered the medications.  (Id.).  Plaintiff contends that Barron actually gave the medication to inmates.  (Plaintiff's Response to County Defendants' Statement at ¶ 17).

The prison contends that any failure to provide prescribed medication was contrary to prison policy and Warden Brennan and the Prison Board were unaware of that failure.  (County Defendants' Statement at ¶ 18).  Plaintiff, however, points out that prison policy required Dr. Khalil, as health-care provider, to provide a regular written report on the health-care delivery system.  (Plaintiff's Response to County Defendants' Statement at ¶ 18).  The prison warden was to review that information and revise the system as necessary.  (Id.).  In practice, however, plaintiff contends that the Warden and Prison Board did nothing to ensure adequate policies and Dr. Khalil never provided a written report.   (Id.).  The written health-care policies of the prison did nothing but copy into the alleged local policies provisions from the Pennsylvania code.  (Id.).  Plaintiff cites to an expert report provided by Dr. Robert Greifinger to support her claim that the health-care policies followed at the prison were wholly inadequate.  (See Id.).

The case also addresses the treatment provided the decedent by Dr. Hasan Khalil.  At the time of the incident, a contract existed between Endless Mountain Health Systems and Susquehanna County to provide health care for inmates at the SCCF.  (Defendant Hassan Khalil's Statement of Material Facts (Doc. 65)

(hereinafter "Khalil's Statement") at ¶ 2).  The plaintiff insists that this contract did not provide for services to be rendered at the prison, but only for hospital care. (Plaintiff's Statement of Facts in Response to Defendant Khalil's Statement (Doc. 77) (hereinafter "Plaintiff's Response to Khlalil") at ¶ 2).  Dr. Khalil works as an independent contractor for Endless Mountain Health System.  (Khalil's Statement at ¶ 3).  The parties dispute, however, whether Dr. Khalil operates independently from Endless Mountain in his role as doctor at that prison.  (Id.; Plaintiff's Response to Khalil, ¶ 3).  According to the plaintiff, Khalil was paid by the prison, and is therefore an employee of the prison.  (Plaintiff's Response to Khalil at ¶ 3).

Dr. Khalil testified that in fulfilling his duties at the prison, he arrives twice a week, visits new inmates, performs physicals on them, and visits sick patients. (Khalil's Statement at ¶ 4).  According to the plaintiff, Dr. Khalil was also required by the prison to provide written reports on the health care delivery system in the prison, and to review his findings with prison administrator's annually.  (Plaintiff's Response to Khalil at ¶ 4).  Khalil did not perform these functions.  (Id.).  He also did nothing to ensure that quality health-care is delivered at the prison, despite what plaintiff claims is a contractual obligation to do so.  (Id.).   The parties dispute whether there was any expectation that Dr. Khalil be at the prison daily, and whether he had knowledge of certain manuals, procedures and regulations in the prison.  (Khalil's statement at ¶¶ 13-18; Plaintiff's response to Khalil at ¶¶ 13-18).  Plaintiff contends that whether he was expected at the prison every day is not relevant to the claim at hand, nor is

7

Khalil's knowledge about prison policies unrelated to medical care.  (Plaintiff's Response to Khalil at ¶¶ 13-18).  The parties also dispute whether Dr. Khalil served as an independent contractor who agreed to visit the principles twice a week, or whether he should be considered the official "prison doctor."  (Khalil's statement at ¶¶ 22-23; Plaintiff's Response to Khalil at ¶¶ 22-23).  Dr. Khalil contends that his role was to visit and examine prisoners who reported a need, while the plaintiff argues that the official prison manual lists Dr. Khalil as the prison's "health care provider." (Khalil's statement at ¶ 24; Plaintiff's Response to Khalil at ¶ 24).

The parties also dispute whether an on-call physician was available at the prison.  (Dr. Khalil's Statement ¶ 5; Plaintiff's Response to Dr. Khalil at ¶ 5). Testimony indicated that under prison policy, a doctor remained on-call at all times, but that prisoners with medical issues were often taken to a hospital rather than treated by a physician.[3]  (Id.).  According to the plaintiff, Dr. Khalil never trained staff on how to recognize an emergency or investigated whether adequate policies exist. (Plaintiff's Response to Dr. Khalil at ¶ 6).  She contends that this policy left prison staff unaware of how to treat ill prisoners and led to Croasdale's death.  (Id.).

The parties dispute who was in charge of medical training for the prison at the

---

[3]The parties dispute over whether a physician was "on-call" when guards at times were permitted to arrange for hospital treatment for ill prisoners rather than contact the on-call physician.  The court fails to see a contradiction between the ability to call a physician when a prisoner seems ill and the ability instead to send a prisoner directly to the hospital. Presumably a prisoner might become immediately and urgently ill, making consultation with the prison physician unnecessary before calling for emergency care.

time of Croasdale's death.  While Deputy Warden Joshua Weller testified that such training was provided by Diamond Pharmacy, plaintiff points out that Weller did not testify that Diamond Pharmacy provided this training at the time of plaintiff's death. (Khalil's Statement at ¶ 9; Plaintiff's Response to Khalil at ¶ 9).  In any case, Diamond Pharmacy's training involved the distribution of pharmaceuticals, and this training, according to the plaintiff, was inadequate.  (Plaintiff's Response to Khalil at ¶ 9).  Moreover, Dr. Khalil alleges that no one ever complained to him that he was supposed to provide medical training at the prison.  (Khalil's Statement at ¶ 10). Plaintiff contends that the testimony on this matter indicates that no one had insisted that Dr. Khalil was to provide training on the distribution of medication.  (Plaintiff's Response to Dr. Khalil at ¶ 10).

Defendants insist that no one at the prison ever complained about the care that Dr. Khalil provided, or asserted that he had not fulfilled his duties as prison doctor.  (Khalil's Statement at ¶ 11-12).  Plaintiff disputes the relevance of any complaints to the question of whether Dr. Khalil violated Croasdale's rights and points to Dr. Robert B. Greifinger's expert report, which concludes that Dr. Khalil fell short of his professional responsibilities by failing to follow nationally-accepted clinical guidelines for treating asthma patients, failing to train staff adequately, and failing properly to organize medical care at the prison.  (Plaintiff's Response to Dr. Khalil at ¶¶ 11-13; see also Report of Dr. Robert B. Greifinger, Exh. B to Plaintiff's Reponse to Dr. Khalil (Doc. 78)).

9

Dr. Khalil performed in intake physical on the decedent on January 19, 2004. (Khalil's statement at ¶ 31).  He found a history of asthma and diagnosed acute bronchitis.  (Id. at ¶ 32).  Khalil prescribed numerous medications, including Levaquin, Fluoxet, and Prednisone.  (Id.).   Khalil saw decedent again on February 10, 2004.  (Id. at ¶ 33).  Khalil diagnosed a shortness of breath secondary to asthma and an upper respiratory infection.  (Id.).  He planned to give her a steroid and antibiotic three times a day for seven days.  (Id.).  Plaintiff disputes whether Khalil wrote this information in his report of the visit or testified to it later, at his deposition. (Plaintiff's response to Khalil's statement at ¶ 33).  He saw decedent again on February 25, 2004.  (Khalil's statement at ¶ 36).  According to the defendants, he prescribed a medrol dose pack and albuterol.  (Id.).  Plaintiff asserts that Khalil never testified that he prescribed albuterol, and that his written order contains no such prescription.  (Plaintiff's response to Khalil's statement at ¶ 36).

Khalil also examined decedent on March 8, 2004.  (Khalil's statement at ¶ 34). Decedent again complained of difficulty breathing and other problems.  (Id.).  The parties dispute what Khalil's notes indicate about the doctor's orders.  (Id.; Plaintiff's response to Khalil at ¶ 34).  Defendant asserts that he prescribed prednisone and albuterol and directed the staff to "continue nebulizer." (Khalil's statement at ¶ 34). Plaintiff contends that there was no direction to continue nebulizer, but only the phrase "nebs albuterol."  (Plaintiff's response to Khalil at ¶ 34).    Khalil next examined decedent on March 19, 2004.  (Khalil's statement at ¶ 35).  Decedent

10

complained of sinus troubles, and defendant insists that Khalil prescribed Biaxin, Evelox and a decongestant.  (Id.).  Plaintiff insists that these drugs were not all prescribed.  (Plaintiff's response to Khalil's statement at ¶ 35).

Decedent complained on February 4, 2004 that she was not allowed to have her nebulizer in her cell.  (Khalil's statement at ¶ 38).  The parties dispute whether defendants acceded to this request.  (See Id at ¶ 39; Plaintiff's response to Khalil's statement at ¶ 38).  Plaintiff insists that the records indicate that plaintiff did not have the nebulizer in her cell, but had to request it from guards when she needed it. (Plaintiff's response to Khalil's statement at ¶ 39).  The parties agree, however, that decedent used the nebulizer on the date of her death.  (Khalil's statement at ¶ 40). They disagree over whether decedent had the machine with her or had to request it. (Khalil's statement at ¶ 42; Plaintiff's response to Khalil's statement at ¶ 42).  Plaintiff insists that the high level of albuterol in decedent's body on the day of her death indicates the extreme distress she was under, not that she had proper access to the asthma medication.  (Plaintiff's response to Khalil's statement at ¶ 41).  In any case, Croasdale's blood was positive for Albuterol at her autopsy.  (Khalil's statement at ¶ 42).

Defendant cites to the statement of an inmate, Deborah Corgan, who reported that the decedent always had a nebulizer in her room, along with medicine.  (Khalil's statement at ¶ 44).  Corgan claimed that the guards had never neglected or mistreated decedent but always helped her during her frequent medical episodes.

11

(Id.).  Plaintiff points out that this statement is unsworn, and made by a prisoner with incentive to help her jailers.  (Plaintiff's response to Khalil's statement at ¶ 44). Similar statements are attributed to inmate Tracy Sherman, and plaintiff offers a similar rejoinder.  (Khalil's statement at ¶ 45; Plaintiff's response to Khalil's statement at ¶ 45).  The statement of Correctional Officer Cheryl Slater that decedent surely had her inhaler in her cell, plaintiff contends, was similarly unsworn and the product of a coercive environment in which Slater had to give her statement in a setting where the warden could hear everything she said.  (Khalil's statement at ¶ 46; Plaintiff's response to Dr. Khalil at ¶ 46).

The prison logbook indicates that decedent had access both to a nebulizer machine and Albuterol when she was incarcerated.  (Khalil's statement at ¶ 47). The logbook indicates 11 instances on which decedent had nebulizer or other asthma treatment.  (Id.).  The logbook also indicates that on February 10, 2004, decedent was allowed–per Dr. Khalil's orders–to keep nebulizer machine "in MIN2." (Id.).  Dr. Khalil does not explain what this notation means.  (Id.).  Plaintiff points out that these entries are not evidence that decedent received appropriate treatment or that employees ever received appropriate training in treating asthma.  (Plaintiff's Response to Khalil's statement at ¶ 47).

Plaintiff filed her initial complaint (Doc. 1) in this court on November 2, 2005. After the parties engaged in some initial discovery and the defendants filed answers or motions to dismiss the complaint, the court granted plaintiff's motion to file an

amended complaint and add an additional party.  (See Doc. 31).  The amended

complaint (Doc. 33) raised a cause of action pursuant to 42 U.S.C. § 1983, alleging

in court one that defendants' conduct violated plaintiff's right to be free of cruel and

unusual punishment under the Eighth Amendment to the United States Constitution

and violated her due process rights under the Fourteenth Amendment.  (Id. at ¶ 63).

Count two, pled against Defendant Khalil, seeks relief for negligence and gross

negligence under Pennsylvania law.  After plaintiff filed this amended complaint,

Defendant Dr. Khalil filed a motion to dismiss that complaint (Doc. 36).  The court

denied this motion on March 21, 2007.  (See Doc. 55).  After the close of discovery,

both Dr. Khalil and the county defendants filed motions for summary judgment

(Docs. 64, 66).  The parties then briefed the issues and the court held argument,

bringing the case to its present posture.

**Jurisdiction**

As this complaint was filed pursuant to 42 U.S.C. § 1983, the court has

jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the

United States.").   The court has supplemental jurisdiction over plaintiff's state-law

claims pursuant to 28 U.S.C. § 1367(a) ("In any civil action of which the district

courts have original jurisdiction, the district courts shall have supplemental

jurisdiction over all other claims that are so related to claims in the action within such

original jurisdiction that they form part of the same case or controversy under Article

II of the United States Constitution.").

**Legal Standard**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  Anderson, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v.

14

Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the

burden shifts to the nonmoving party, who must go beyond its pleadings, and

designate specific facts by the use of affidavits, depositions, admissions, or answers

to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

**Discussion**

The county defendants and Dr. Khalil raise different grounds for granting their

motions to dismiss.  The court will address each in turn.

**a.  The County Defendants**

Defendants Susquehanna County, William Brennan, Susquehanna County

Prison Board, Joann Wiser and Carole Smalacombe ("County Defendants") filed a

motion for summary judgment.  The County Defendants' brief addresses these

defendants separately.

**i.  Susquehanna County and Susquehanna County Prison Board**

Defendants argue that Susquehanna County and the Susquehanna County

Prison Board should be granted summary judgment because plaintiff has not

produced any evidence that decedent's demise was the product of a policy or

custom established by the County of the Prison Board.  In a Section 1983 case,

respondeat superior liability does not exist, and the plaintiff must show that her

injuries were caused by a policy or custom established by the defendant

municipality.   Defendants contend that plaintiff has not identified an inadequate

policy, and indeed a policy existed mandating that prisoners have access to

medications approved by the prison doctor.  The policy also directed an initial

medical examination.  As such, plaintiff cannot show that Croasdale's death was the

result of defendants' policy or custom.

The Supreme Court has held that "[o]nly where a municipality's failure to train

its employees in a relevant respect evidences a 'deliberate indifference' to the rights

of its inhabitants can such a shortcoming be properly thought of as a city 'policy or

custom' that is actionable under § 1983."  City of Canton v. Harris, 489 U.S. 378, 389

(1989).  Further, "[w]hen a plaintiff alleges that a municipality has not directly inflicted

an injury, but has caused an employee to do so, stringent standards of culpability

and causation must be applied to ensure that the municipality in a § 1983 suit is not

held liable solely for the conduct of its employee."  Reitz v. County of Bucks, 125

F.3d 139, 145 (3d Cir. 1997).   These strict standards exist because "in enacting §

1983, Congress did not intend to impose liability on a municipality unless *deliberate*

action attributable to the municipality itself is the 'moving force' behind the plaintiff's

deprivation of federal rights."  Board of the County Commissioners of Bryan County,

Oklahoma v. Brown, 520 U.S. 397, 399 (1997).

In order to prevail on such a claim, "a plaintiff seeking to impose liability on a

municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused

the plaintiff's injury."  Id. at 403.  Liability attaches either to an official policy or to a

"custom" that constitutes a "practice . . . so widespread as to have the force of law."

Id. at 404.  In the context of a motion to dismiss a plaintiff "must allege that a 'policy

16

or custom' of [the defendants] was the 'moving force' behind a violation of his . . .

rights." Grayson v. Mayview State Hosp., 293 F.3d 103, 107 (3d Cir. 2002) (citing

Brown, 520 U.S. at 404).  Because plaintiff's claim here has to do with Croasdale's

death, that claim is brought pursuant to the Eighth Amendment to the United States

Constitution, arguing that decedent suffered cruel and unusual punishment.  The

Supreme Court has established that "deliberate indifference to serious medical

needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'

proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104 (1976)

(quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  "Deliberate indifference"

means that a prison official is "both aware of the facts from which the inference could

be drawn that a substantial risk of serious harm exists, and . . . must also draw the

inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

The court finds that the County could be liable here.  The defendants do not

deny that Croasdale's asthma represented a "serious medical need."  While

defendants argue that adequate policies were in place to prevent Croasdale's death,

the plaintiff has introduced evidence in the form of Dr. Greifinger's report that

indicates that defendant did not follow its own policies on having a doctor assess

patients with severe medical conditions within 24 hours of admission, on having a

doctor examine such patients within fourteen days of arrival at the prison, on

providing mental health services, on providing access to emergency care, and in

other areas of prison health care that could have helped protect Croasdale's life.[4]  A jury could find that this failure to follow policies was not an oversight, but had become a custom.  Thus, a jury could conclude that the prison articulated a policy that laid out the procedures necessary to protect prisoner's health, and then deliberately and wantonly chose to ignore that policy.  As such, plaintiff has evidence by which a jury could conclude that the custom in the prison was inadequate in a way that was deliberately indifferent to serious medical needs like Croasdale's asthma.  The court will deny the motion for summary judgment on this point.

### ii.  Warden William Brennan

Defendants assert that Warden Brennan cannot be liable because there is no evidence that the Warden acted with deliberate indifference to the decedent's needs.

---

[4] Dr. Greifinger's report concludes that, whatever the prison's stated policies, in practice it, did not provide:
- an assessment of prisoners within 24 hours of their arrival
- a medical history and physical exam within 14 days of admission
- delivery of mental health services
- adequate collection of information
- an annual documented review of the prison's health care delivery system
- access to emergency care 24 hours per day
- management of pharmaceuticals
- medications issued as prescribed by the prison doctor
- staff investigation of prisoners' failure to take medicine as prescribed
- physician approval of medications brought to prison
- documentation of refusals to take medications
- inventory of bulk supplies

According to this report, the prison also did not obtain medical records for the decedent, which plaintiff claims contributed to Croasdale's death.  They did not provide her with treatment for her depression, and Dr. Khalil did not examine her adequately.  On the date of her death, an ambulance did not arrive until 53 minutes after the emergency first became apparent.  (See Report of Dr. Robert Greifinger, Exh. F. to Plaintiff's Response to County Defendants' Statement (hereinafter "Greifinger Report")).

Brennan merely relied on the judgment of the prison doctor and followed his judgment.  He also enforced the Board's policies.  Plaintiff combines her arguments about the prison board with her arguments about Warden Brennan.  She contends that Brennan is subject to supervisory liability because he was personally involved in the decisions not to implement policy sufficient to protect ill inmates and his role in implementing those policies was causally related to the injury Croasdale suffered.

The Third Circuit Court of Appeals has established that "to hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice."  Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001).  To prevail on such a claim, the plaintiff must do more than "argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did."  Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).  Instead, the plaintiff must show what the defendant "failed to do that evidences his deliberate indifference."  Id.  "Normally, an unreasonable risk in a supervisory liability case will be shown by evidence that such harm has in fact occurred on numerous occasions.   Similarly, deliberate indifference to a known risk will ordinarily be demonstrated by evidence that the supervisory official failed to respond

19

appropriately in the face of an awareness of a pattern of such injuries." Id.  Still,

"there are situations in which the risk of constitutionally cognizable harm is so great

and so obvious that the risk and the failure of supervisory officials to respond will

alone support findings of the existence of an unreasonable risk, of knowledge of that

unreasonable risk, and of indifference to it." Id.

Plaintiff argues that Defendant Brennan, as warden, created and implemented

the policies that led to Croasdale's death and therefore should be liable in a

supervisory sense.  Plaintiff points to evidence which she contends indicates that

Warden Brennan did not act to investigate prison medical policies or ensure their

adequacy, even though prison policies created at least in part by the warden

indicated that he needed to do so.  (See Deposition of Warden William Brennan,

Exh. C to Khalil's Statement (Doc. 69-2) at 47, 53).  First, the court notes–as

explained above–that a jury could find that a custom or policy existed at the prison

that caused an Eighth Amendment violation.  A failure to have adequate policies for

reviewing patient health conditions and delivering them medical could constitute

deliberate indifference to a serious medical need.  See, e.g., Monmoth County

Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (finding

that "[d]eliberate indifference is also evident where prison officials erect arbitrary and

burdensome procedures that 'result in interminable delays and outright denials of

medical care to suffering inmates.'"  Second, a jury could find that Warden Brennan,

by not following prison policy requiring reviews of the medical system to ensure it

protected prisoner's health, was aware of that unreasonable risk.  Third, Brennan took no action to correct the problem, and a jury could find him indifferent to it. Finally, a jury could find that Croasdale died due to a lack of access to medication and treatment, and thus that her injury resulted from the policy or practice.

Defendant Brennan also argues that he is entitled to qualified immunity for any actions he took to establish prison policies.  "[P]rison officials are entitled to qualified immunity from monetary liability if they are acting reasonably in the good-faith fulfillment of their responsibilities." Wilson v. Schillinger, 761 F.2d 921, 929 (3d Cir. 1985).  Qualified immunity provides that "[g]overnment officials performing discretionary functions will be immune from liability for civil damages if their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known." Id. at 930.  In this case, Croasdale's constitutional right to be free of cruel and unusual punishment were clearly established, and a reasonable person would have known that creating a prison health system that failed to care for seriously ill prisoners would violate that right.  As such, qualified immunity is not available here for Warden Brennan.

### iii.  Joann Wiser

The allegations against Correctional Officer Wiser are that she was present at the time of Croasdale's death and failed to provide her with a nebulizer and then refused to perform CPR on her.  Defendants contend that the evidence indicates that decedent had her nebulizer in her cell and used it before her death.  No evidence,

therefore, indicates that Wiser withheld medication or that this medication caused Croasdale's death.  Wiser made a decision, based on her training, not to perform CPR.  Decedent was still breathing when Wiser made this decision, and no evidence indicates that the failure to perform CPR caused her death.

The court finds that a jury could conclude that Wiser's behavior constituted deliberate indifference to a serious medical need.  A question of fact exists as to whether the decedent actually had ready access to her nebulizer or whether she had first to go through guards to use it.  There is also a question of fact as to whether Wiser provided that access when Croasdale requested it.  In addition, there is evidence by which a jury could conclude indicates that a considerable period of time passed between when Croasdale first indicated a need to go to the hospital for treatment and the time an ambulance arrived.  (Compare Deposition of Joann Wiser, Exh. I to Khalil's Statement (Doc. 69) at 24; Greifinger Report at ¶ 48).  In the medical context, courts have found "deliberate indifference" in a number of ways, "including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended treatment."  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  Wiser's delays in calling for assistance, combined with an unwillingness to perform CPR, could lead a jury to find that Wiser refused to provide medical treatment she knew Croasdale needed or prevented Croasdale from receiving that

treatment.  "Where prison authorities deny reasonable requests for medical treatment . . . such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury, deliberate indifference is manifest.'"  <u>Lanzaro</u>, 834 F.2d at 346.  (citations omitted).  The court will therefore deny the motion on this point.

### iv.  Carol Smalacombe

Defendants contend that the only claim against Correctional Officer Smalacombe is that she refused to provide Croasdale with her nebulizer.  She was not on duty and not present at the facility on the date of Croasdale's death.  Since Croasdale had a nebulizer at the time of her death, Smalacombe cannot be liable for depriving the decedent of treatment.

Plaintiff concedes that she has no claim here.  The court will therefore grant the motion as unopposed as it relates to Defendant Smalacombe.  She will be dismissed from the case.

### b.  Dr. Khalil

At oral argument, defendant conceded that decedent's asthma–which led to her death–constituted a serious medical need.  We therefore have only to decide whether Dr. Khalil's behavior amounted to deliberate indifference to this need.  Dr. Khalil argues that plaintiff does not have evidence sufficient for a jury to conclude that his behavior manifested deliberate indifference.  Khalil saw decedent five times, and each time prescribed medication to treat her complaints.  Though plaintiff may be unhappy with the treatment that decedent received, Khalil argues that the

treatment itself was not so deficient as to manifest unnecessary and wanton infliction of pain.  Moreover, Khalil responded to decedent's complaint that she did not have her nebulizer in her cell by ordering that the device be kept in decedent's cell.  The high levels of albuterol in decedent's body at the time of her death indicates that she received this treatment as Dr. Khalil ordered.  Plaintiff argues that there is evidence of Dr. Khalil's deliberate indifference both in his failure to ensure that Croasdale received the medication she needed in the prison and in Dr. Khalil's failure to fulfill his responsibility as prison medical doctor to ensure an adequately functioning health system.

To prevail on her claim against Dr. Khalil, plaintiff must show he was (1) "deliberately indifferent" to (2) a "serious" medical need.  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  In this context, however, "[i]t is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'"  Id.  "[P]rison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners."  Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).  Still, such "deliberate indifference [can] exist in a variety of circumstances, including where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care' or where 'short of absolute denial . . . necessary medical treatment is . . . delayed for non-medical reasons,' or where 'prison authorities prevent an inmate from receiving recommended treatment.'"  Id. at 68 (quoting Lanzaro, 834 F.2d at 346).

24

In this case, Dr. Khalil testified that he had seen decedent for several years before she died, and was aware of her asthma.  (Deposition of Dr. Hassan Khalil, Exh. B to Khalil's Statement (Doc. 69-2) (hereinafter "Khalil Dep.") at 30).  He had prescribed use of a nebulizer as treatment for her asthma, and recommended that she use it as many as four times a day.  (Id.).  The decedent was to decide when she needed to take the medication, and was to have it with her at all times in case of emergency.  (Id. at 30-31).

On February 10, 2004, Croasdale made a request to see a doctor in the prison.  (Id. at 45).  When Dr. Khalil saw her, he diagnosed a shortness of breath secondary to asthma and an upper respiratory infection.  (Id.).  To combat this illness, he prescribed prednisone and amoxicillian.  (Id.).  Dr. Khalil also examined Croasdale on February 25, 2004, after she complained she had difficulty breathing.  (Id. at 39).  He diagnosed her as asthmatic and prescribed prednisone and an increase in her access to the nebulizer to every four hours as needed.  (Id. at 40).  On March 6, 2004, Croasdale requested "sick call" and saw Dr. Khalil.  (Id. at 44).  He diagnosed her with asthma and prescribed prednisone and use of a nebulizer.  (Id. at 45).  Dr. Kahlil saw decedent again on March 19, 2004, when she made a request for sick call.  (Id. at 43).  He diagnosed her with sinusitus and prescribed Avelox and a decongestant.  (Id. at 44).

Dr. Khalil testified that after he sees a patient in prison he writes notes on the request he received for a sick call.  (Id. at 45).  He then gives the notes to a prison

employee, who was assigned to give the medication to the inmate.  (Id. at 46).  Dr.

Khalil did not testify that he ever acted to ensure that his orders had been followed.

He also never asked Croasdale if she had access to her nebulizer or the drugs

necessary to use it in her cell.  (Id. at 65).

The court finds that summary judgment is appropriate for Dr. Khalil on this

claim.  To prove liability for deliberate indifference in medical treatment, a plaintiff

must show something more than negligence.  In Durmer v. O'Carroll, the Third

Circuit Court of Appeals found that a jury could find deliberate indifference when a

prison doctor ignored pleas from a prisoner for necessary physical therapy,

disregarded a recommendation from a neurologist consulted by the prison doctor

that the inmate begin therapy, and appeared more interested in saving the prison

money than in providing necessary treatment.  Durmer, 991 F.2d at 68.  The court

emphasized that "if the inadequate care was a result of an error in medical judgment

. . . [plaintiff's] claim must fail; but, if the failure to provide adequate care . . .  was

deliberate, and motivated by non-medical factors, then [plaintiff] has a viable claim.

Id. at 69.  Here, the plaintiff claims that the inadequate medical treatment came in

not ensuring that Croasdale had access to the medication for her nebulizer at all

times.  Plaintiff has not presented any evidence, however, to indicate that the failure

to provide this medical treatment in this particular instance was deliberate, or

motivated by non-medical factors, such as a desire to save the prison money.

Instead, the evidence indicates that Khalil simply failed to ensure that his orders

were followed.  While such a failure might sound in negligence, it does not constitute

deliberate indifference.  Plaintiff could not prevail on this claim on these grounds.

In the alternative, plaintiff argues that Dr. Khalil could be liable for an Eighth

Amendment violation because of his responsibilities as prison doctor and policy

maker at the prison.  Plaintiff argues that Khalil was in charge of a prison medical

system that was so substandard that it caused decedent's death.  Khalil denies that

he ever held this role, but instead had the limited role of performing intake physicals

and seeing prisoners on sick call.  He also denies that he trained anyone in medical

care at the prison.  While the prison handbook identified Dr. Khalil as the prison

doctor, he claims he never received a copy of that document and was not aware of

any policy or procedure manuals distributed to the corrections officers.  In addition,

no prison official testified that Dr. Khalil was expected to do more than he had done.

Thus, defendant argues that no evidence indicates that Khalil was in charge of any

aspect of prison healthcare except for the intake physicals and twice-weekly visits for

which he was paid.  Moreover, even if Khalil could be termed the prison doctor

defendant contends he could not be liable for Croasdale's death.  No evidence

indicates that Khalil knew of and was deliberately indifferent to the conditions which

plaintiff avers caused Croasdale's death.

Because this aspect of plaintiff's Eighth Amendment claim relates not to Dr.

Khalil's treatment of Croasdale, but to his role as prison doctor, the court will analyze

the issue in terms of that role.  The court considers this a question of supervisory

liability.  As a preliminary matter, the court finds that there is a genuine question of

material fact as to whether Dr. Khalil was a policy maker at the prison and thus

potentially liable in a supervisory sense.  Dr. Khalil points to evidence which

indicates that he took a very limited role, simply seeing patients and prescribing

medicine.  Though Khalil may have been called the "prison doctor," that did not

mean he was present on all occasions or played any role in setting up the prison's

medical system.  Plaintiff, on the other hand, cites to evidence which indicates that

Dr. Khalil had a responsibility to monitor and update the prison health system.

Plaintiff also has expert reports that indicate that Dr. Khalil allowed obvious

deficiencies to linger.  A reasonable juror could, therefore, find that Dr. Khalil was a

decisionmaker in implementing the policies here in question, and the court will

examine whether plaintiff's claims can survive summary judgment on supervisory

liability.

Next, the court must determine whether evidence exists by which a jury could

find "a specific policy or practice that the supervisor failed to employ and show that:

(1) the existing policy or practice created an unreasonable risk of the Eighth

Amendment injury; (2) the supervisor was aware that the unreasonable risk was

created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from

the policy or practice."  Beers-Capitol, 256 F.3d at 134.  The court finds here that

plaintiff has identified through his expert a series of policies which the jury could

conclude created an unreasonable risk of an Eighth Amendment violation.  The

28

failure to provide proper access to medication and medical treatment for people with serious illness like Croasdale could be seen by a jury as deliberate indifference to a serious medical need.  Likewise, the jury could conclude that Khalil was aware of this risk and indifferent to it in the way that he performed his duties as prison medical director.  Evidence indicates that Khalil did not engage in the duties required of that position, despite his alleged obligations.  Finally, a reasonable jury could find that Croasdale's death resulted from this custom.  As such, the court will deny summary judgment on these grounds.

The parties agree that plaintiff has stated a claim against Dr. Khalil for medical negligence and that claim should go to trial.

**Conclusion**

For the reasons stated above, the court will grant the defendants' motions for summary judgment in part and deny them in part.  Defendant Carol Smalacombe's motion for summary judgment will be granted, and she will be dismissed from the case.  The motions for summary judgment will be denied in all other respects.  An appropriate order follows.  The following are the issues remaining in the case: (1) whether Warden Brennan and the county defendants established a policy or custom that amounted to deliberate indifference to decedent's serious medical need; (2) whether Defendant JoAnn Wiser's treatment of decedent on the day she died amounted to deliberate indifference to decedent's serious medical needs; (3) whether Defendant Khalil's treatment of decedent amounted to medical malpractice

under Pennsylvania law; and (4) whether Dr. Khalil was in charge of establishing the

prison's medical care system to a degree sufficient to make him liable in a

supervisory sense, and, if so, whether he could be liable for establishing a policy or

custom that amounted to deliberate indifference to decedent's serious medical need.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOLORES B. SPARKS,** | : | **No. 3:05cv2274** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **SUSQUEHANNA COUNTY,** | : | |
| **WILLIAM BRENNAN,** | : | |
| **SUSQUEHANNA COUNTY PRISON** | : | |
| **BOARD,** | : | |
| **JOHN DOES 1-10,** | : | |
| **HASSAN KHALIL,** | : | |
| **JOANN WISER, and** | : | |
| **CAROLE SMALACOMBE,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### ORDER

**AND NOW**, to wit, this 3rd day of April 2009, the defendants' motions for summary judgment are **GRANTED** in part and **DENIED** in part, as follows:

1) Defendant Hassan Khalil's motion for summary judgment (Doc. 64) is **DENIED**; and

2) The motion for summary judgment of Susquehanna County, William Brennan, Susquehanna County Prison Board, Joann Wiser and Carole Smalacombe (Doc. 66) is **GRANTED** with respect to Defendant Carole Smalacombe and **DENIED** in all other respects.

31

BY THE COURT:

s/ James M. Munley
JUDGE JAMES M. MUNLEY
United States District Court